# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

LAURA K. KLING,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C12-3007-MWB

## REPORT AND RECOMMENDATION

---

Plaintiff Laura Kling seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for supplemental security income ("SSI") disability benefits pursuant to Title XVI of the Social Security Act ("Act"). Kling contends that the administrative record ("AR") does not contain substantial evidence to support the Commissioner's decision that she was not disabled. For the reasons that follow, I recommend that the Commissioner's decision be reversed and remanded for further proceedings.

### Background

Kling was born in 1967 and completed school through the eighth grade. AR 48-49. She later attempted to obtain a GED but did not do so. AR 49. She has past relevant work experience as a babysitter. AR 28, 423. The ALJ determined that Kling has the following medically diagnosed impairments that are severe in nature and would impose work-related limitations: "…degenerative disc disease of the lumbar spine and depression." AR 21.

On March 12, 2009, Kling protectively filed an application for SSI, alleging disability beginning February 27, 2009.[1]  AR 231-34, 356.  The claim was denied initially on June 22, 2009, and on reconsideration on August 27, 2009.  AR 125-27, 175-79, 185-88.  Kling then requested a hearing before an Administrative Law Judge ("ALJ").  AR 189-91.  On June 15, 2010, ALJ Jo Ann Draper held a hearing and on August 12, 2010, issued a decision denying Kling's application.  AR 19-38.  Kling sought review by the Appeals Council.  On December 7, 2011, the Appeals Council denied her request for review.  AR 1-3.  The ALJ's decision thus became the final decision of the Commissioner.  AR 1; *see also* 20 C.F.R. § 416.1481.

On January 30, 2012, Kling filed a complaint in this court seeking review of the ALJ's decision.  This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case.  The parties have briefed the issues and the matter is now fully submitted.

## *Summary of Evidence*

I have reviewed the entire administrative record and find the following evidence relevant to Kling's claim:

---

[1] Kling filed prior applications for SSI in 2004 and 2006.  AR 228-30, 236.  The applications were denied by administrative law judges on August 23, 2006, and February 26, 2009.  AR 87-97, 110-23.  The Appeals Council denied Kling's requests for review of both denials.  AR 105-09, 128-30.  In this case, the ALJ noted the previously filed claims and expressly refused to reopen or reconsider those determinations.  AR 19.  As the Commissioner points out, in the absence of a colorable constitutional claim the Act does not authorize judicial review of a decision by the Commissioner applying res judicata or refusing to reopen a prior claim.  *See Boock v. Shalala*, 48 F.3d 348, 351 (8th Cir. 1995); *Brown v. Sullivan*, 932 F.2d 1243, 1245-46 (8th Cir. 1991) (citing *Califano v. Sanders*, 430 U.S. 99, 107-09 (1977)).  Because Kling asserts no constitutional claim, the ALJ's refusal to reopen the prior decisions is not reviewable.  My review is limited to determining whether the ALJ correctly found that Kling has not been disabled since February 27, 2009, her alleged onset date in this case.  AR 231.

*A. Medical Evidence of Physical Impairment*

In her Disability Report, Kling alleged the following physical impairments: degenerative disc disease, hypertension and gastroesophageal reflux disease. AR 361. Dr. Subhash Sahai has been her primary care provider since 1990. AR 541. In March 2006, plaintiff saw Dr. Sahai "for [a] disability evaluation." AR 430. At that time, Kling reported that "she can physically do everything." *Id.* Dr. Sahai found that Kling was capable of returning to work. *Id.*

In November 2006, Kling complained of low back pain radiating into her buttocks but not down her leg. AR 465. She denied numbness and tingling. *Id.* Dr. Sahai noted plaintiff's "history of a herniated disc in the low back . . . without significant compression of the cord." *Id.* A straight leg raise test was negative and Kling had full range of motion in her back. *Id.* Kling also walked on her heels and toes. *Id.* Dr. Sahai recommended stretching exercises and prescribed Vicodin as necessary for pain. *Id.*

In May 2007, MRI scanning showed multilevel degenerative disc disease from L3-S1. AR 490. In April 2008, Kling reported low back pain on the left side. AR 518. She denied numbness, tingling, or radiation down the legs. *Id.* Dr. Sahai administrated an epidural injection and prescribed Flexeril. *Id.*

In May 2008, an x-ray of Kling's lumbar spine showed "grossly normal" alignment. AR 529. "There [was] mild disc space narrowing at L5-S1 but disc spaces [were] otherwise grossly maintained." *Id.* An MRI showed a small central ruptured disc at L3-L4 and L4-L5, which was unchanged from the most recent MRI in May 2007. AR 530, 554. It also showed left paracentral inferior disc extrusion at L5-S1 with displacement of the left S1 nerve root. AR 530.

Later in May 2008, Kling received another epidural injection. AR 533. She then followed up with Dr. Sahai, who noted that "[Kling] has done exceedingly well as far as back pain and the extremity pain is concerned." AR 517.

In September 2008, Kling complained of recurring low back pain to Darin Eklund, Dr. Sahai's physician assistant. AR 514. She stated that the pain was not radiating down her legs. *Id.* She reported that the epidural injection in May provided relief for four months. AR 514, 532. On examination, Kling showed full range of motion in her back. AR 514. Straight leg raise testing was negative. *Id.* Eklund continued Kling's medications and Dr. Sahai gave her another epidural injection. AR 514, 532.

In January 2009, Dr. Sahai treated Kling for hypertension and kidney stones. AR 539. In February 2009, a kidney ultrasound was normal. AR 539-40. Later that month, Kling followed up with Dr. Sahai, who reported that she "[h]as done well." AR 539. In March 2009, Dr. Sahai wrote a letter discussing Kling's medical history. AR 541. He stated that despite taking pain medication, anti-inflammatory agents, antidepressants and anti-anxiety medication, Kling "has been limited as far as ability to work effectively in a number of jobs." *Id.* He further reported that "it is very difficult for her to have gainful employment because of her multitude of medical problems and any consideration towards the disability approval would be highly appreciated." *Id.*

In May 2009, Kling followed up with Eklund for her hypertension. AR 551. Eklund reported that Kling "is doing much better" since a medication dosage adjustment. *Id.* Kling reported "no other problems" except for a sore inside her nose. *Id.*

In June 2009, Kling reported to the emergency room with a bitemporal headache that had "been going off and on for 3 weeks." AR 559. The attending physician prescribed anti-inflammatory medication (Toradol) and advised Kling to follow up with her primary care doctor. *Id.*

Kling saw Dr. Sahai in August 2009 and reported back pain radiating down the left leg. AR 603. She received another epidural injection. *Id.* Later that month, Kling said that she "[h]as done well" except for "a tingling sensation down the left leg since her epidural." AR 625. She reported "[n]o other complaints." *Id.* An MRI later that month showed a "central subligamentous protrusion [at L5-S1] without effacing effects" and annular tears at L3-L4 and L4-L5. AR 637.

In September 2009, Kling reported back pain and tingling down both legs. AR 624. Dr. Sahai noted that the recent MRI showed annular tears but no impingement or encroachment on the cord. AR 624. He prescribed a new medication (Neurontin) for nerve pain. *Id.*

In January 2010, Kling reported back pain radiating to her right leg. AR 623. A lumbar spine MRI showed a disc protrusion at L5-S1 compressing the right S1 nerve root. AR 595, 604. The MRI also revealed annular tears at L3-L4 and L4-L5. AR 595. Dr. Sahai administered another epidural injection. AR 601.

In March 2010, Dr. Sahai referred Kling for an orthopaedic consultation with Sarkis Kaspar, M.D. AR 608. A lumbar spine x-ray showed "[m]ild degenerative changes at L5-S1 with no evidence of acute osseous injury." AR 613. Kling described her back pain as a two on a ten-point scale, but said she was "pain-free" during the consultation. AR 608-09. She reported relief from the four epidural injections, and said that the most recent one "remarkably" helped. AR 608. She said that "[s]ince early February, she has been a lot better." *Id.* However, she wanted to consult with a surgeon in the event that the pain returned. *Id.*

Dr. Kaspar described Kling's herniation at L5-S1 as "a moderate-sized herniation, but symptomatically much improved." AR 609. He noted that the relief she received from epidural injections "may be a sign that [the] disc is becoming walled off, or healing

in other words." AR 610. Dr. Kaspar discussed surgery with Kling but recommended continued "conservative care" unless her symptoms worsened. *Id.*

Dr. Sahai completed a Medical Source Statement in June 2010. AR 640-44. He reported that Kling could occasionally lift twenty pounds and frequently lift ten pounds; sit five hours total in an eight-hour workday and one hour continuously before she needed to stand or walk; and stand and walk for two hours total in an eight-hour workday and for thirty minutes continuously before she needed to lie down. AR 640-41. Due to pain, Dr. Sahai concluded that Kling needed to rest one-and-a-half-hours during an eight-hour workday. AR 641. In addition, he reported that she could occasionally handle and finger with the right hand and frequently handle and finger with the left hand. AR 642. Dr. Sahai stated that Kling would be absent from work more than four times per month due to her impairments. AR 644.

## B. *Medical Evidence of Mental Impairment*

The record indicates that Kling saw a mental health professional "a long time ago," but not since. AR 70-71. Her family physician, Dr. Sahai, did treat her for depression. AR 468. She reported stress arising from the fact that her husband was convicted of having sex with a 15-year-old and sentenced to prison. AR 427, 468. She also suffered from the deaths of two grandchildren. AR 503. Dr. Sahai's Medical Source Statement, completed in June 2010, indicated that Kling had moderate limitations in activities of daily living and social functioning. AR 643. He also stated that plaintiff would "often" have deficiencies in concentration, persistence, and pace resulting in a failure to timely complete tasks and that she had experienced repeated episodes of decompensation. *Id.*

## C.    *Consultative Examinations*

Joseph Latella, D.O., conducted a consultative physical examination in May 2009.   AR 554-55.   Kling reported that she was no longer receiving state assistance and was applying for disability benefits.   AR 554.   Although she never had a driver's license, she stated that she "can ride a long time in a car."   *Id.*   She reported that she lives alone and handles her own finances.   *Id.*   She last worked in 1995 but had received state aid.   *Id.*

Kling reported that she could kneel, crawl, and climb stairs.   *Id.*   On examination, Kling showed decreased flexion of her lumbar spine, which Dr. Latella attributed to a ruptured disc.   AR 555, 557.   Straight leg raise testing was normal.   AR 557.   Kling walked with a normal gait and without an assistive device.   *Id.*   She also demonstrated full grip strength and full strength in her extremities.   AR 556-57.

Melanie Porter, Psy.D., conducted a consultative psychological examination in May 2009.   AR 544-50.   Kling reported mood disturbances "off and on throughout the years" due to her "tumultuous [twenty-one year] relationship" with her husband, who regularly cheated on her.   AR 544.   Kling reported that her husband was currently in prison for having sex with a minor.   AR 544.   She stated that she would like to end their marriage but did not have the financial resources to do so.   *Id.*   In addition, Kling reported having flashbacks concerning twin grandchildren who died shortly after being born.   *Id.*

Dr. Porter noted that Kling "walked to and from my office without significant difficulty," with a normal gait, and "sat in a relaxed position on the couch."   AR 548. She described Kling's mood as "mildly depressed."   *Id.*   A mental status examination revealed "easy to understand" speech; clear, coherent, and goal-directed thinking; and adequate judgment and insight.   *Id.*   Kling was able to immediately recall three out of three items but after a five-minute delay could recall only two out of three.   AR 549.

Kling showed no signs of hallucinations, delusions, obsessions, compulsions, or suicidal thoughts. AR 548-49. She reported that she worried excessively about how her husband has been absent from her children's lives. AR 549. Dr. Porter concluded that despite Kling's mood disturbances, she would likely be able to remember and understand simple instructions, procedures, and locations. *Id.* However, her ability to carry out these instructions might be impaired due to loss of concentration. *Id.* As such, Dr. Porter concluded that Kling might need repeated instructions and additional time to complete tasks. *Id.* Dr. Porter assigned a global assessment of functioning (GAF) score of 45.[2] AR 550.

## D. *Hearing Testimony*

Kling testified that she was 43 years old at the time of the hearing and had an eighth-grade education. AR 48-49. She lived with her fourteen-year-old son. AR 50. When asked about household chores, Kling testified that she did laundry and dishes and "[tried] to dust once in awhile." AR 68. Her son did the vacuuming. *Id.*

Kling reported that her back pain "starts in the middle of the back and goes all the way down on the right side to my toes." AR 52. Moreover: "Below the knee in the back of the leg is complete numbness and the last two toes on my right foot." *Id.* She stated that even at its best, when she was in the most comfortable position and had taken pain medication, the pain was a three or four on a scale of ten. AR 53-54. On a

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF of 41 to 50 indicates the individual has serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job). *Id.*

normal day, moving around the house and engaging in activities other than reclining would cause the pain to reach a level of eight or nine. AR 54.

Kling testified that during a normal eight-hour day, she reclined three-fourths of the time. AR 57. She stated that she could sit one hour continuously before needing to stand, but even if she was allowed to alternate positions every hour, she could not work a sedentary job due to pain. AR 57-59. She further testified that due to carpal tunnel syndrome, she had problems using her hands, especially the right hand. AR 67. She stated that she could type on a keyboard for thirty to forty-five minutes. AR 68.

Kling testified that she sometimes suffered from migraine headaches that would reach a pain level of ten. AR 60. On average, this would occur once every other month and would last up to two or three days. AR 60-61. During these headaches, Kling would take aspirin and stay in bed with the room dark. AR 61. She also testified that in between these severe headaches, she would have additional headaches that were not as severe. AR 66. These occurred once or twice per week. *Id.*

When asked what factors would cause her to see a mental health professional, if one were readily available, Kling stated: "My separation from my husband, losing my house, him going to prison and why he's there. Had the loss of two grandkids. Just different things." AR 71. She testified that this has caused periods of sadness and crying spells, three or four times per week. AR 72. When these occurred, they "ruin[ed] my whole day." *Id.* She also testified that she had difficulty sleeping at night, partly due to the medications she was taking. AR 73-74. She stated that she has suffered from a lack of appetite due to depression and that she had lost a lot of weight (approximately 70 pounds) as of the date of the hearing. AR 79.

The VE, Vanessa May, testified that Kling's only past, relevant work was babysitter, a semi-skilled, medium-work position with a SVP[3] level of 3. AR 82. The ALJ then asked a series of hypothetical questions:

> Q.      Now could you please assume that we have a hypothetical individual who has the same vocational profile as our claimant. In other words in age, education, past work experience. So we have a younger individual as defined by Social Security Regulations with a limited eighth grade education and past work which would be consistent with the past work summary that you've provided and your testimony just now. Now this first hypothetical individual is exertionally limited to the performance of no more than sedentary work specifically lifting and carrying up to 10 pounds occasionally, five pounds frequently. Standing would be limited to six hours a day, sitting six hours a day. This individual should be able to change postural positions approximately at least every 60 minutes. That wouldn't necessarily mean leaving the work area but simply a chance to rest the back by standing and stretching. This individual would be unable and should avoid constant and repetitive handling and fingering with both hands. This hypothetical individual who is left hand dominant could only frequently handle and finger with the left dominant hand and would be limited to only occasional handling and fingering with the right non-dominant hand. This individual should never climb ropes, ladders or scaffolds. This individual would be limited to tasks that could be learned in 30 days or less involving no more than simple work related decisions with few work place changes. And should be limited to an environment free of fast paced production requirements. Now with those limitations could this individual perform any work that's been performed within the last 15 years?

> A.      No, Your Honor.

---

[3] "SVP" refers to Specific Vocational Preparation, which is defined in Appendix C of the *Dictionary of Occupational Titles* as being "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." An SVP of 3 equates to preparation exceeding one month up to and including three months. *See Dictionary of Occupational Titles*, Appendix C.

Q.      Are there any jobs at the sedentary level of exertion that could be performed by an individual who was limited in this way?

A.      And you said that the handling and fingering was frequent with the left which is dominant?

Q.      Yes.

A.      Okay.

Q.      Yes, I did.

A.      Based on this hypothetical some examples would be a call out operator, DOT number 237.367-014. There are approximately 175 jobs in Iowa, 16,000 jobs nationally. Another job would be a charge account clerk, DOT number 205.367-014.   There are about 200 jobs in Iowa, and 32,000 jobs nationally.   Another job would be a telephone quotation clerk. It's DOT 237.367-046. There are approximately 700 jobs in Iowa, and 75,000 jobs nationally. And those are all SVP 2, sedentary.

Q.      Okay. Now let me ask you this. What if I changed a limitation on the dominant left hand to only occasional handling and fingering. Would these jobs, call out operator, charge account clerk, and telephone quotation clerks, still be able to be performed with that limitation?

A.      I believe so. I want to check on one of them.

Q.      Okay.

A.      Well, based on the DOT's description the telephone quotation clerk would require frequent handling and fingering so that one would be eliminated.

Q.      Okay. Now if this individual – hypothetical individual number one or actually even hypothetical individual number two were unable to sustain the necessary stamina to complete a full eight hour work day, five days a week, 40 hours a week, on a continuing basis would these jobs still be able to be performed?

A.    No, not on a full time competitive basis.

Q.    If either one of these hypothetical individuals missed two to three days of work each month would these jobs still be able to be performed?

A.    No. Again they would not be available full time.

Q.    Let me ask you this. What if we had an individual who was unable to work at a consistent pace throughout the day and up to one-third of each work day could only perform work at a slow pace at best, how would that limitation affect the ability to perform these jobs.

A.    They would not be competitive, Your Honor.

AR 82-85.

### *Summary of ALJ's Decision*

The ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since March 12, 2009, the application date (20 CFR 416.971 *et seq.*).

2.    The claimant has the following severe impairments:  degenerative disc disease of the lumbar spine and depression (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(b) such that she could lift 10 pounds occasionally and 5 pounds frequently; stand for 6 hour [sic] in an 8-hour workday; sit for 6 hours in an 8-hour workday if the opportunity to change postural positions, standing and stretching, every 60 minutes within the work area. The claimant should avoid constant, repetitive handling and fingering bilaterally.

The claimant would be able to only frequent hand and finger with the left dominant hand but only occasionally handle and finger with the right hand. She could never climb ladders, ropes or scaffolds. The work would be limited tasks learned in 30 days or less involving no more than simple work-related decisions and few workplace changes. The environment must be free of fast-paced production requirements.

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.  The claimant was born on February 27, 1967 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has a limited 8th grade education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 12, 2009, the date the application was filed (20 CFR 416.920(g)).

AR 21-30.

The ALJ found that Kling's headaches are not severe impairments, noting that the medical records show that they remained quiescent for years and recurred only for short

periods of time. AR 22. The ALJ also found that Kling's unintended weight loss did not give rise to a severe impairment. *Id.*

In finding that Kling's impairments do not meet or medically equal any listed impairment, the ALJ referenced listings 1.00ff and 12.00ff. *Id.* The ALJ considered the "paragraph B" criteria, which require that the mental impairment result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. AR 22-23. The ALJ found that Kling has mild restriction in activities of daily living and social functioning, moderate difficulties maintaining concentration, persistence or pace, and no periods of decompensation. AR 23. The ALJ also considered the "paragraph C" criteria and found that they are not present. *Id.*

In determining Kling's RFC, the ALJ first summarized the objective medical evidence. AR 24-26. She then addressed Kling's statements concerning her symptoms and found her to be "less than fully credible." AR 27-28. The ALJ found that the symptoms Kling reported could reasonably be expected to result from her medically-determinable impairments, but that Kling's statements as to the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the ALJ's RFC determination. *Id.* Among other things, the ALJ noted that Kling's reports of daily activities remained "largely unchanged" during the period of time covered by the medical records in evidence. *Id.* She also found that Kling's complaints are not consistent with the objective medical evidence. *Id.*

The ALJ then discussed the opinion evidence in the record. She accorded "some weight" to the opinions of the treating source (Dr. Sahai). AR 28. She accorded greater weight to the consultative opinion of Dr. Porter concerning Kling's mental limitations. *Id.* AR 28. Finally, the ALJ found that the state agency's

non-examining consultants failed to adequately consider Kling's subjective complaints, including the effects of chronic pain, on her physical functioning.   *Id.*

After determining Kling's RFC, the ALJ found she is unable to perform her past relevant work as a babysitter.   AR 28.   However, based on the VE's responses to hypothetical questions, the ALJ found that considering Kling's age, education, work experience and RFC, Kling is able to make a successful adjustment to other work that exists in significant numbers in the national economy.   AR 29-30.   As such, she determined that Kling is not disabled within the meaning of the Act.   AR 30.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905.   A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."   42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.   20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   First, the Commissioner will consider a claimant's work activity.   If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.   20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v),

416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and

give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### Discussion

Kling raises three arguments in challenging the ALJ's decision:

1. There is not substantial evidence in this record to support the ALJ's determination of Plaintiff's RFC and therefore not sufficient to support her decision.

2.    The ALJ failed to give appropriate consideration to the expert opinion of the treating physician, Dr. Subhash Sahai, M.D., and gave no reasonable explanation for failing to do so.

3.    The overwhelming evidence of record, when given the weight the rules demand, support[s] a finding that Plaintiff is disabled and a remand for payment of benefits is appropriate.

Doc. No. 9 at 5-11.   For reasons that will become clear below, I need not address all three arguments at this time.   Instead, because it is apparent that the ALJ failed to comply with the Commissioner's regulations concerning the analysis of treating-source medical opinions, I will recommend remand for purposes of re-weighing the medical opinion evidence and providing an explanation for the weight given to each.

The Social Security regulations state, in relevant part:

Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

20 C.F.R. § 404.1527(d)(2) [emphasis added].[4]   What this means is that a treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.   *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).   A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).   But that opinion will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.   *Hacker*, 459 F.3d at 937.   The ALJ must "always give good reasons" for the weight given to a treating physician's evaluation.   20 C.F.R § 404.1527(d)(2); *see also Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007).

When a treating physician's opinion is entitled to controlling weight, the ALJ must defer to the physician's medical opinions about the nature and severity of an applicant's impairments, including symptoms, diagnosis and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions.   20 C.F.R. § 404.1527(a)(2); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). However, a treating physician's conclusion that an applicant is "disabled" or "unable to work" addresses an issue that is reserved for the Commissioner and therefore is not a "medical opinion" that must be given controlling weight.   *Ellis*, 392 F.3d at 994.

Under these standards, the opinions contained in Dr. Sahai's letter of March 9, 2009, are not "medical opinions" entitled to controlling weight.   After summarizing Kling's medical situation, he concluded by stating:   "I feel it is very difficult for her to have gainful employment because of her multitude of medical problems and any consideration towards the disability approval would be highly appreciated."   AR 541.

---

[4] Section 404.1527 has been amended, with certain paragraphs being re-numbered.   All citations to that section in this ruling are to the version in effect during the relevant period of time.

As noted in *Ellis,* this is not a "medical opinion" but, instead, a conclusion reserved for the Commissioner.

The opinions Dr. Sahai provided in June 2010 are different. He completed a Treating Source Medical Statement that provided detailed opinions about the nature and severity of Kling's impairments, what Kling is capable of doing despite the impairments and the resulting restrictions. AR 640-44. In that document, he stated that during a regular, eight-hour workday, Kling would need more rest than that which would be provided by regular breaks and a lunch period. AR 641. In addition to those scheduled breaks, he indicated that she would have to spend one hour per workday reclining or lying down to relieve pain. *Id.* He also stated that Kling would be able to use her hands only occasionally, for fingering, picking, pinching or otherwise working primarily with the fingers, and would only be able to reach with her right arm occasionally and grasp or handle with the right hand occasionally. AR 642. He reported that she would often have deficiencies of concentration, persistence or pace resulting in a failure to complete tasks in a timely manner. AR 643. He indicated that she had experienced repeated (three or more) episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from that situation or to experience exacerbation of signs and symptoms. *Id.* Finally, he stated that because of her impairments or treatments, she would likely be absent from work more than four times a month. AR 644.

Dr. Sahai has been Kling's treating physician for over twenty years. AR 541. He is clearly a "treating source" within the meaning of the Commissioner's rules (the Commissioner does not argue otherwise). Thus, Dr. Sahai's opinions are entitled to "controlling weight" so long as they are (a) well-supported by medically acceptable clinical and laboratory diagnostic techniques and (b) consistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2). Moreover, even if his

opinions are not entitled to controlling weight, the regulations outline factors the ALJ must consider in deciding the weight to give them:

> When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion.

20 C.F.R. § 404.1527(d)(2).   Those factors are:

> (i)     Length of the treatment relationship and the frequency of examination.
>
> (ii)    Nature and extent of the treatment relationship.
>
> (iii)   Supportability.
>
> (iv)   Consistency [with the record as a whole].
>
> (v)    Specialization.
>
> (vi)   Other factors [which tend to support or contradict the opinion].

20 C.F.R. § 404.1527(d).

As noted above, the ALJ is required to "always give good reasons" for the weight given to a treating physician's evaluation." 20 C.F.R § 404.1527(d)(2); *see also Davidson,* 501 F.3d at 990.   Here, the ALJ simply declared that she was giving only "some weight" to Dr. Sahai's opinions.   AR 28.   She did not explain why.   The Commissioner admits, rather delicately, that "the ALJ did not affirmatively state why [she] did not adopt Dr. Sahai's entire opinion."   Doc. No. 10 at 21.   In fact, it is far worse than that.   The ALJ did not explain why any of his opinions, as expressed in the June 2010 Treating Source Medical Statement, are entitled to less than controlling weight.   Nor did she provide an analysis of the Section 404.1527(d) factors to explain why the opinions are entitled to only "some weight," instead of great weight or controlling weight.

In his brief, the Commissioner makes a valiant effort to fill in the gaps and explain why the ALJ might have decided to give only "some weight" to Dr. Sahai's opinions.

Doc. No. 10 at 21-22. This *post hoc* analysis does not suffice. The ALJ's decision is the final decision of the Commissioner. AR 1; *see also* 20 C.F.R. § 416.1481. The Commissioner's regulations state: "We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(d)(2). It is undisputed that the ALJ, and therefore the Commissioner, failed to provide any reasons, let alone good reasons, for giving only limited weight to Dr. Sahai's opinions.

The amount of weight given to Dr. Sahai's opinions is critical in this case because of the VE's answers to the ALJ's hypothetical questions. The VE testified that a hypothetical individual would be unable to perform the positions the VE previously identified if (a) that individual could not complete full, eight-hour work days or (b) that individual would need to miss two or three days of work each month. AR 84-85. If Dr. Sahai's opinions, as stated in his June 2010 Treating Source Medical Statement, are entitled to more than just "some weight," then the VE's testimony would appear to support a finding of disability. As such, I have no choice but to recommend remand of this case with directions for the ALJ to re-weigh the medical opinion evidence in accordance with the Commissioner's regulations, to provide good reasons for the weight ultimately given to Dr. Sahai's medical opinions, and to determine what effect, if any, this analysis has on the ALJ's RFC determination and other findings.[5]

---

[5] It is premature to address Kling's other arguments at this time. The ALJ's RFC determination clearly depends on the weight given to the medical opinion evidence. Likewise, Kling's argument that the evidence in the record, when properly weighed, supports a finding of disability, cannot be resolved until the ALJ re-weighs the medical opinion evidence and provides an appropriate analysis.

*Recommendation*

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **reversed**, this case be **remanded** for further proceedings consistent with this report, and judgment be entered in favor of Kling and against the Commissioner.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).


**IT IS SO ORDERED.**

**DATED** this 31st day of January, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA